JONATHAN E. NUECHTERLEIN
General Counsel
GREGORY A. ASHE
BRIAN S. SHULL
PETER LAMBERTON
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719 (Ashe)
Telephone: 202 -326-3720 (Shull)
Telephone: 202-326-3274 (Lamberton)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, bshull@ftc.gov, plamberton@ftc.gov

DANIEL G. BOGDEN
United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>SEQUOIA ONE, LLC, a Wyoming limited liability company, GEN X MARKETING GROUP, LLC, a Florida limited liability company, JASON A. KOTZKER, THERESA D. BARTHOLOMEW, JOHN E. BARTHOLOMEW, JR., and PAUL T. MCDONNELL,<br><br>    Defendants. | **Case No. 2:15-cv-01512**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2       Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

3   1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act

4 ("FTC Act"), 15 U.S.C. § 53(b) to obtain permanent injunctive relief, rescission or reformation

5
6 of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other

7 equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15

8 U.S.C. § 45(a).

9
10               **JURISDICTION AND VENUE**

11   2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and

12 1345, and 15 U.S.C. §§ 45(a) and 53(b).

13   3.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

14
15                    **PLAINTIFF**
  4.      The FTC is an independent agency of the United States Government created by statute.

16 15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which

17
18 prohibits unfair or deceptive acts or practices in or affecting commerce.

19   5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys,

20 to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate,

21 including rescission or reformation of contracts, restitution, the refund of monies paid, and the

22 disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), and 56(a)(2)(B).

23
24                  **DEFENDANTS**

25   6.      Defendant Sequoia One, LLC ("Sequoia One") is a Wyoming limited liability company

26 with its principal place of business at 101 E. Kennedy Boulevard, Suite 1450, Tampa, Florida.

27 Sequoia One has also used addresses at 1426 Gulf to Bay Boulevard, Suite B, Clearwater,

28

Florida, 2511 Deer Run E, Clearwater, Florida, and 10268 Royal Eagle Street, Highlands Ranch, Colorado.  Sequoia One registered the websites budgetmetoday.com and paydayloanpreapprovalnow.com.  Sequoia One transacts or has transacted business in this district and throughout the United States.

7.      Defendant Gen X Marketing Group, LLC ("Gen X") is a Florida limited liability company with its principal place of business at 1426 Gulf to Bay Boulevard, Suite A and Suite B, Clearwater, Florida.  Gen X has also used addresses at 101 E. Kennedy Boulevard, Suite 1450, Tampa, Florida, 2519 McMullen Booth Road, Suite 510-121 and Suite 510-196, Clearwater, Florida, and 861 Christina Circle, Oldsmar, Florida.  Gen X owns the fictitious business name "Pay Me Loans."  Gen X also registered the websites paymeloans.com and directfundingservice.com.  Gen X transacts or has transacted business in this district and throughout the United States.

8.      Defendant Jason A. Kotzker is an owner, member, and/or manager of Sequoia One, and a manager of Gen X, and is an authorized signatory for many of those entities' bank accounts.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint, including the Defendants' sale of consumer payday loan applications containing consumers' Social Security and financial account numbers, as well as other sensitive information, without the consumers' knowledge or consent, to third parties that used the information to commit fraud.  In addition, Kotzker knew about the business practices set forth in this Complaint, was recklessly indifferent to them, or was aware of a high probability of the fraud and intentionally avoided the truth.  In connection with the matters alleged herein, Kotzker transacts or has transacted business in this district and throughout the United States.

9.      Defendant Theresa D. Bartholomew ("T. Bartholomew") is a manager of Gen X and is an authorized signatory for many of its bank accounts as well as Sequoia One's bank accounts.  At all times material to this Complaint, acting alone or in concert with others, she formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint, including the Defendants' sale of consumer payday loan applications containing consumers' Social Security and financial account numbers, as well as other sensitive information, without the consumers' knowledge or consent, to third parties that used the information to commit fraud.  In addition, T. Bartholomew knew about the business practices set forth in this Complaint, was recklessly indifferent to them, or was aware of a high probability of the fraud and intentionally avoided the truth.  In connection with the matters alleged herein, T. Bartholomew transacts or has transacted business in this district and throughout the United States.

10.      Defendant John E. Bartholomew, Jr. ("J. Bartholomew"), at all times material to this Complaint, acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint, including the Defendants' sale of consumer payday loan applications containing consumers' Social Security and financial account numbers, as well as other sensitive information, without the consumers' knowledge or consent, to third parties that used the information to commit fraud.  In addition, J. Bartholomew knew about the business practices set forth in this Complaint, was recklessly indifferent to them, or was aware of a high probability of the fraud and intentionally avoided the truth.  In connection with the matters alleged herein, J. Bartholomew transacts or has transacted business in this district and throughout the United States.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11.     Defendant Paul T. McDonnell is a manager of Gen X and is an authorized signatory for many of its bank accounts.  McDonnell also is listed as the registrant contact for paymeloans.com, directfundingservice.com, budgetmetoday.com, and paydayloanpreapprovalnow.com.  At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint, including the Defendants' sale of consumer payday loan applications containing consumers' Social Security and financial account numbers, as well as other sensitive information, without the consumers' knowledge or consent, to third parties that used the information to commit fraud.  In addition, McDonnell knew about the business practices set forth in this Complaint, was recklessly indifferent to them, or was aware of a high probability of the fraud and intentionally avoided the truth.  In connection with the matters alleged herein, McDonnell transacts or has transacted business in this district and throughout the United States.

12.     Defendants Sequoia One and Gen X ("Corporate Defendants") operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below.  Defendants conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds.  Because the Corporate Defendants operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Kotzker, T. Bartholomew, J. Bartholomew, and McDonnell formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constituted the common enterprise.

**COMMERCE**

13.     At all times material to this Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

14.     From at least 2011 to at least 2013, Defendants operated as data brokers, collecting and selling sensitive consumer information from consumer payday loan applications to non-lenders. In particular, Defendants sold this information to at least one non-lender, Ideal Financial Solutions, Inc. and its subsidiaries (collectively, "Ideal Financial"), knowing or having reason to know that Ideal Financial used the information to make unauthorized debits from the consumers' bank accounts.

**Defendants Collected Consumer Payday Loan Applications**

15.      Defendants collected hundreds of thousands of consumer payday loan applications from numerous and various payday loan websites.  A payday loan is the common name used for a short-term, high-fee, unsecured loan, often made to consumers to provide needed funds in anticipation of an upcoming paycheck.

16.     "Publishers," entities that create these payday loan websites, typically offer to help consumers obtain payday loans.  To do so, they require consumers to fill out online applications containing sensitive financial information.  Most applications, including the ones collected by Defendants, contain the consumer's name, address, phone number, employer, Social Security number, and bank account number, including the bank routing number.  Payday lenders use this information to evaluate consumers' loan applications and to transfer funds to consumers' bank accounts if they approve the loans.

17.     Publishers transfer the applications to data brokers who find buyers for the applications. Data brokers also may transfer the applications to other data brokers in search of buyers.

18.     Defendants, as data brokers, purchased payday loan applications from a number of different publishers and other data brokers.  Defendants also obtained payday loan applications directly from consumers by publishing or causing to be published, their own websites that purported to help consumers obtain payday loans.  Defendants' websites included, but are not limited to, paymeloans.com, directfundingservice.com, budgetmetoday.com, and paydayloanpreapprovalnow.com.

**Defendants Sold Consumer Payday Loan Applications to Non-Lenders, Including Ideal Financial**

19.     In numerous instances, Defendants sold payday loan applications to non-lender third parties that did not use the information to assist consumers in obtaining payday loans or other extensions of credit.  These non-lender third parties included phony Internet merchants, such as Ideal Financial, that used consumers' sensitive information to commit fraud by debiting consumers' bank accounts for purported financial products that the consumers never purchased. These non-lender third parties have no legitimate need for the Social Security and financial account numbers contained in the payday loan applications.

20.     From at least April 2011 through at least January 2013, Defendants sold payday loan applications or information assembled from them to Ideal Financial.

21.     At first, Defendants sold the payday loan applications directly to Ideal Financial. Defendants' activities with Ideal Financial, however, drew the scrutiny of banks and payment processors almost from the start.  For example, email exchanges between Defendants and Ideal Financial in May 2011 discuss merchant accounts being shut down and the need "to constantly be working on getting new" merchant accounts.  In or around October 2012, Defendants devised

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a plan to circumvent such scrutiny by involving a third-party company to hide their activities. Although Defendants considered at least two companies to use in this plan, they settled on an existing third-party company named Pinnacle Processing, Inc. ("Pinnacle") because, as Defendant Kotzker explained, "Pinnacle is a stronger entity."  Defendants helped set up websites in Pinnacle's name that advertised a purported payday loan-finding service.  Defendants then claimed to be selling to Pinnacle the payday loan applications of consumers who purportedly enrolled in Pinnacle's service through those websites.  In reality, Defendants transferred the leads purportedly sold to Pinnacle directly to Ideal Financial, which used the information to bill consumers without their authorization.  Pinnacle served merely as a front, and behind the scenes, Defendants closely directed the Pinnacle activities that are material to this Complaint.

**Consumer Injury Caused By Defendants' Sale Of Consumer Payday Loan Applications to Ideal Financial**

22.     Between January 2009 and February 2013, Ideal Financial purchased at least 2.2 million consumers' financial information from various data brokers, including Defendants, and used it to make millions of dollars in unauthorized debits and charges.  Ideal Financial processed at least 1.5 million unauthorized charges, totaling at least $43 million, to consumer bank accounts using information from consumer payday loan applications purchased from Defendants and other data brokers.

23.     Consumers did not consent to these debits and only learned of them after Ideal Financial had debited their bank accounts.  Ideal Financial falsely told complaining consumers that they purchased its bogus financial management or counseling products at a payday loan website.  In some instances, consumers also were forced to close their bank accounts or suffered insufficient funds fees because of Ideal Financial's unauthorized charges.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

24.     Defendants provided Ideal Financial with financial account information for at least

500,141 consumers. Using only the consumer information provided by Defendants, Ideal

Financial debited at least $7,135,993.23 from consumer bank accounts without authorization.

**Defendants Knew Or Had Reason To Believe That Ideal Financial Was Using Consumer Information To Engage In Unauthorized Charges**

25.     Defendants knew that many consumers whose accounts were debited by Ideal Financial

did not authorize those debits.  For example, in May 2011, Defendant Kotzker was informed by

an Ideal Financial executive that Ideal Financial was billing consumers through a "blind bump" –

that is, billing consumers for a purported service that was hidden in website terms and

conditions.  As another example, in January 2013, in response to increased questions and

scrutiny by banks, Ideal Financial explained to its payment processor that Defendants were

buying payday loan applications that had been declined by lenders and sending the information

to Ideal Financial for "blind billing" – that is, billing consumers without their notice or

authorization.  Ideal Financial further explained that "most if not all" consumers who called to

complain about the charges asserted they had never seen or been on the website offering the

purported service.

26.     Defendants  also continued to sell leads to Ideal Financial after numerous indicators that

it was charging consumers without the consumers' authorizations.  For example, Defendants

continued to sell leads even after receiving regular reports from Ideal Financial as well as

correspondence and other documents that showed large amounts of refunds or chargebacks,

customer complaints explaining that they had not authorized the charges, and inquiries by law

enforcement and other government agencies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

27.     In addition, in numerous instances, Defendants sold payday loan applications to Ideal

Financial for approximately $0.50 per application at the time that legitimate lenders often paid

approximately $10 to $100 per application.

28.     Further, Defendants worked with Ideal Financial to try to hide the effects of the

unauthorized billing practices.  One way Defendants did so was to bury, in the fine print of the

payday loan websites' terms and conditions pages, language by which consumers purportedly

agreed in advance to being charged by Ideal Financial.  Then, when a consumer called to

complain or seek a refund, Ideal Financial could explain that the consumer had previously

consented to the charge.  For example, in one instance, Defendant J. Bartholomew informed

Ideal Financial that Sequoia One had created a new website and that Sequoia One "need[ed] this

site used in CS [customer service]."  In an email response to, among others, Defendants Kotzker

and J. Bartholomew, Ideal Financial agreed, explaining, "The more sites we can get that have

opt-in in the tncs [terms and conditions] the better, it give[s] the agents more ammo to through

[sic] at confused customers."

29.     Similarly, Defendants helped Ideal Financial make a series of credit and debit

microtransactions – that is, credits and debits to a consumer's bank account of a few cents each

that are made prior to the consumer being charged for the purported product or service.  These

microtransactions were purportedly intended to "validate" an account for "verification

purposes."  In reality, the purpose of these microtransactions was to dilute the unauthorized

return ratio to reduce the likelihood of alerting their merchant banks of fraudulent activity.

30.     Nonetheless, until January 2013, Defendants continued selling to Ideal Financial

consumer payday loan applications, including consumers' names, addresses, dates of birth,

Social Security and bank account numbers, and other sensitive information.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VIOLATIONS OF THE FTC ACT**

31.      Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

32.      Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

**COUNT I**

33.      As set forth in paragraphs 14 to 30 above, Defendants sold consumer payday loan applications that included consumers' social security and financial account numbers to non-lenders that had no legitimate need for this sensitive personal information.  These non-lenders included phony online merchants, like Ideal Financial, that used the information to debit consumer accounts without authorization.

34.      Defendants actions caused or were likely to cause substantial injury to consumers that consumers could not reasonably avoid themselves and that were not outweighed by countervailing benefits to consumers or competition.

35.      Therefore, Defendants' practices as described above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

**CONSUMER INJURY**

36.      Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THIS COURT'S POWER TO GRANT RELIEF

37.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

1    Dated: August 7, 2015                    Respectfully submitted,

2                                             JONATHAN E. NUECHTERLEIN
                                              General Counsel
3

4
                                             */s/Gregory A. Ashe*
5                                             GREGORY A. ASHE
                                             BRIAN SHULL
6                                             PETER LAMBERTON
                                             Federal Trade Commission
7                                             600 Pennsylvania Avenue NW
                                             Washington, DC 20850
8                                             Telephone: 202-326-3719 (Ashe)
                                             Telephone: 202 -326-3720 (Shull)
9                                             Telephone: 202-326-3274 (Lamberton)
                                             Facsimile: 202-326-3768
10                                            Email: gashe@ftc.gov, bshull@ftc.gov,
                                             plamberton@ftc.gov
11

12
                                             DANIEL G. BOGDEN
13                                            United States Attorney
                                             BLAINE T. WELSH
14                                            Assistant United States Attorney
                                             Nevada Bar No. 4790
15                                            333 Las Vegas Blvd. South, Suite 5000
                                             Las Vegas, Nevada 89101
16                                            Telephone: (702) 388-6336
                                             Facsimile: (702) 388-6787
17

18                                           Attorneys for Plaintiff
                                             FEDERAL TRADE COMMISSION
19

20

21

22

23

24

25

26

27

28